Thurman, J.
This is a bill for the specific execution of a real *339 contract, which bears date June 17, 1848, but was, in truth, executed and- delivered on a Sunday. To decide whether this fact, namely, its execution and delivery on a Sunday, renders it invalid, the cause was reserved.
*It is not pretended that, at common law, this contract would be void. I am aware that in Smith v. Sparrow, 12 Eng. Com. Law, 254, Chief Justice Best said, “that he should have considered that if two parties act so indecently as to carry on their business on a Sunday, if there had been no statute on the subject, neither could recover.” But this was a mere dictum, the unsoundness of which is rendered apparent by a multitude of authorities. The chief justice cited no case in its support, and I have been unable to discover a single one sufficient to uphold it. Yery rarely has it been pretended, even in argument, that a contract, entered into on a Sunday, is, for that reason, void at the common law; and those who have so pretended, placed their chief, if not sole reliance, upon the saying of Lord Coke, that “the Christian religion is part of the common law; ” and upon what appears in 2 Inst. 220, where, after citing a Saxon law of King Ethelstan, in these words, “Die autem dominico nemo mercaturam facito; id quod si quis egerit, et ipsa merce, et triginta prasterea solidis mulctator,” he adds: “Here note by the way, that no merchandising should be on the Lord’s day.” But, after considering these very observations, Lord Mansfield, in Drury v. Defontaine, 1 Taunt. 135, said that “ it does not appear that the common law ever considered those contrates as void which were madeon Sunday.” And, accordingly, he gave judgment for the price of a horse sold on that day. That he was right, is apparent from numerous cases, among which are Comyns v. Boyer, Cro. Eliz. 485; Rex v. Brotherton, 1 Stra. 702; The King v. Whitenash, 7 B. & C. 596; S. C., 14 Eng. Com. Law, 100; and Bloxsome v. Williams, 3 B. & C. 232; S. C., 10 Eng. Com. Law, 60.
Indeed, so uniform are the authorities, that Redfield, J., in Adams v. Gay, 19 Vermont, 365, said, in effect, that no case could be found holding a contract to be void at common law because executed on a Sunday. This remark, if not literally true, is so nearly so, that perhaps the only case that seems opposed to it is Morgan v. Richards, decided in one of the inferior courts of Pennsylvania. 1 P. A. Browne, 171. With this exception, all the cases, English and American, so far as I can discover, in which contracts have *340 been declared void because made on Sunday, rest upon the ground of a statutory prohibition.
But were it otherwise, were such a contract void by the common law of England, it would not necessarily follow that it is void in-Ohio. The English common law, so far as it is reasonable in itself, suitable to the condition and business of our people, and consistent with the letter and spirit 'of our federal and state constitutions and statutes, has been and is followed by our courts, and may be said to constitute a part of the common law of Ohio. But wherever it has been found wanting in either of these requisites, our courts have not hesitated to modify it to suit our circumstances, or, if necessary, to wholly depart from it. Lessee of Lindsley v. Coates, 1 Ohio, 243; O. C. 116. Christianity, then, being a part of the common law of England, there was some, though an insufficient, foundation for the saying of Chief Justice Best above quoted. But the constitution of Ohio having declared, “ that all men have a natural and indefeasible right to worship Almighty God according to the dictates of conscience; that no human authority can, in any case whatever, control or interfere with the rights of conscience ; that no man shall be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent; and that no jireference shall ever be given, by law, to any religious society, or mode of worship, and no religious test shall be required, as a qualification to any office of trust or profit,” it follows that neither Christianity, nor any other system of religion, is a part of the law of this state. "We sometimes hear it said that all religions are tolerated in Ohio ; but the expression is not strictly accurate—much less accurate is it to say, that one religion is a part of our law, and all others only tolerated. It is not by mere toleration that every individual here is protected in his belief or disbelief. He reposes not upon the leniency of government, or the liberality of any class or sect of men, but upon his natural indefeasible rights of conscience, which, in the language of the constitution, are beyond *the control or interference of any human authority. We have no union of church and state, nor has our government ever been vested with authority to enforce any religious observance, simply because it is religious.
Of course, it is no objection, but, on the contrary, is a high recommendation, to a legislative enactment, based upon justice or public policy, that it is found to coincide with the precepts of a pure *341 religion; but the fact is nevertheless true, that the power to make the law rests in the legislative control over things temporal and not over things spiritual. Thus the statute upon which the defendant relies, prohibiting common labor on the Sabbath, could not stand for a moment as a law of this state, if its sole foundation was the •Christian duty of keeping that day holy, and its sole motive to enforce the observance of that duty. For no power over things merely spiritual, has ever been delegated to the government, while .any preference of one religion over another, as the statute would give upon the above hypothesis, is directly prohibited by the constitution. Acts evil in their nature, or dangerous to the public wel.fare, may be forbidden and punished, though sanctioned by one religion and prohibited by another; but this creates no preference whatever, for they would be equally forbidden and punished if all religions permitted them. Thus, no plea of his religion could shield a murderer, ravisher, or bigamist; for' community would be at the mercy of superstition, if such crimes as these could be committed with impunity, because sanctioned by some religious delusion.
We are, then, to regard the statute under consideration as amere municipal or police regulation, whose validity is neither strengthened nor weakened by the fact that the day of rest it enjoins is the Sabbath day. Wisdom requires that men should refrain from labor at least one day in seven, and the advantages of having the day of rest fixed, and so fixed as to happen at regularly recurring intervals, are too obvious to be overlooked. It was within the constitutional competency of the general assembly to require this cessation of labor, and to name the day of rest. It did so by the act referred *to, and, in accordance with the feelings of a majority of the people, the Christian Sabbath was very properly selected. -But, regarded merely as an exertion of legislative authority, the act would have had neither more nor less validity had any other day been .adopted.
In support of these views, I might refer to various authorities, but I shall content myself with citing the cases of Specht v. The Commonwealth, 8 Barr, 312, and The City Council of Charleston v. Benjamin, 2 Strobh. Law, 508. The constitution of Pennsylvania, like our constitution of 1802, declared that “ all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can, of right, be compelled to attend, erect, or support any place of worship, or to main *342 tain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience; no man can, of right, be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience; and no preference shall ever be given by law to any religious establishments or modes of worship.” The legislature of Pennsylvania passed an act which, among other things, prohibited any person to “ do or perform any worldly employment or business whatever on the Lord’s day, commonly called Sunday, works of necessity or charity only excepted.” Eor a violation of this statute, Specht was prosecuted. In' his defense, he tendered a plea that he was a Seventh-Day Baptist, in full communion, and conscientiously believed the seventh day of the week to be the true Sabbath of the Lord, and that ho accordingly observed it as such. His plea was overruled, and he was sentenced to pay a fine; to reverse which sentence he prosecuted the suit to which I have referred.
On his behalf, it was argued that the statute attempted to “ control or interfere with the rights of conscience,” and was therefore unconstitutional. “ It evidently,” said his counsel, 11 treats the first day of the week as a holy, a sacred day; and it prohibits labor on that day, not for the purpose of giving rest to man, as a more civil regulation, but because it profanes the Lord’s day.” But the court held differently. After ^admitting that there are are expressions in the statute, that justify the conclusion that one of the motives of the law-makers may have been to prohibit the profanation of a day regarded by them as sacred, the court proceeded to develop the true ground upon which the statute rests, as follows :
“ All agree that to the well-being of society, periods of rest are absolutely necessary. To be productive of the required advantage, these periods must recur at stated intervals, so that the mass of which the community is composed may enjoy a respite from labor at the same time. They may be established by common consent, or, as is. conceded, the legislative power of the state may, without impropriety, interfere to fix the time of their stated return, and enforce obedience to the direction. When this happens, some one day must be selected, and it has been said, the round of the week presents none which, being preferred, might not be regarded as favoring some one of the numerous religious sects into which mankind are divided. In a *343 Christian community, where a very large majority-of the people celebrate the first day of the week as their chosen period of rest from labor, it is not surprising that that day should have received the legislative sanction; and as it is also devoted to religious observ-' anees, we are prepared to estimate the reason why the statute should speak of it as the Lord’s day, and denominate the infraction of its legalized rest a profanation. Yet this does not change the character of the enactment. It is still, essentially, but a civil regulation made for the government of man as a member of society."
The court further proceed to show, that the statute interferes with no man’s conscience, compels no religious observance, “ enters upon no discussion of rival claims of the first and seventh days of the week, treats no religious doctrine as paramount in the state,” and gives no preference to any sect; that “ the selection of the day of rest is but a question of expediency," and that the adoption of Sunday confers “ no superior religious position upon those who worship upon that day.”
The judgment of the inferior court was therefore affirmed.
, ^Charleston v. Benjamin was the case of a Jew who was charged with selling goods on Sunday, contrary to an ordinance of the city council. The case went to the court of appeal upon the question, whether the ordinance was repugnant to that provision, in the constitution of South Carolina, which declares that “ the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever, hereafter be allowed within this state, to all mankind; provided that the liberty of conscience thereby declared, shall not be so construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace or safety of this state.” The court held the ordinance to be valid. They said it interfered with no one’s conscience, and was in derogation of no one’s religion; that it was “ a mere police or municipal regulation,” and that religion had nothing to do with it. “If,” said the court, “ the legislature, or the city of Charleston, were to declare that all shops within the state or city should be closed, and that no one should sell or offer to sell any goods, wares, or merchandise, on the 4th of July or 8th of January, in each year, would any one believe such a law was unconstitutional ? It could not be pretended that religion had anything to do with that! What has religion to do with a similar regulation for Sunday ? It is, in a political and *344 social point of view, a mere day of rest. Its observance, as such, is a mere question of expediency.”
Bearing in mind, then, that the legislative power in Ohio has never extended to the enforcement of religious duties, merely because they are religious; that, politically and legally considered, the power to prescribe a day of rest is simply a municipal power, and the injunction a civil regulation and nothing more, let us examine the statute upon which the defendant relies. It is the first section of an act, passed February 17, 1831, Ourwen’s Stat. 208, and is in these words: “ That if any person of the age of fourteen years and upward, shall be found on the first day of the week, commonly called Sunday, sporting, rioting, quarreling, hunting, fishing, *or at common labor (works of necessity and charity only excepted), he or she shall be fined in a sum not exceeding five dollars, nor less than one dollar: Provided, that nothing herein contained shall be so construed to extend to those who conscientiously do observe the seventh" day of the week as the Sabbath; nor to prevent families emigrating, from traveling; watermen from landing their passengers; superintendents or keepers of toll-bridges from attending and superintending the same; or ferrymen from conveying travelers over the waters, or persons removing their families on such days.”
The next section of this act, and which throws some light upon the meaning of that just quoted, is as follows :
“ That if any tavern-keeper or other person shall sell or barter any spirituous liquors on the first day of the week, commonly-called Sunday, except to travelers on a Sunday, [journey?] such tavern-keeper or other person so offending, shall be fined in a sum not exceeding five dollars.”
The general proposition that a contract, made in violation of a statutory prohibition, is void, is not controverted. And that the infliction of a penalty, for the commission of an act, is equivalent .to an express prohibition of such act, seems to be settled by great weight of authority. “ Common labor ” upon a Sunday, being, then, prohibited in Ohio, with the exceptions stated in the act, the question for our consideration is this: Was the execution and delivery of the contract, in the bill mentioned, “common labor” within the meaning of the statute ? If the answer bo in the affirmative, we must hold the contract void; if in the negative, it is not affected by the time of its execution and delivery.
*345 Numerous cases may be found in which contracts, entered into uipon a Sunday, have been declared invalid ; but it will be seen, by an examination of the statutes under which these decisions were made, that they are, in every instance, much more comprehensive than the act we are considering. Their prohibition is,not of com•mon labor simply, but of any manner of worldy business, save acts of necessity or charity. *Thus, in Fennell v. Ridler, 5 B. & C. 406; 11 Eng. C. L. 261, it was held that a contract for the sale and warranty of a horse, made upon a Sunday, was void as between the parties to it. But the English statute, 29 Car. 2, c 7, provides that no person “ shall do or exercise any worldy labor-, •business, or work, of their ordinary callings, upon the Lord’s day ■or any part thereof, works of necessity and charity only excepted.’ Now, it was not so much as suggested, that the sale of the horse fell under the denomination of “ labor ” or “ work.” On the contrary, the court .put it expressly under the term “ business.” “ That the purchase of a horse by a horse-dealer is an exercise of the business of his ordinary calling, no one can doubt,” was the language of the court. And that the words “ labor, business, and work,” were not considered as synonymous, is apparent from the entire opinion, and especially from the following passage, in which they are •clearly treated as distinct: “ Labor may be private, and not meet the public eye, and so not offend against public decency; but it is equally labor, and equally interferes with a man’? religious duties. The same may be said of business or work. Each may be public and meet the public eye; each may be private and concealed. There is nothing in the position of the word ‘business,’ between those of ‘ labor and work,’ which in our judgment can justify us in giving to it anything but its ordinary meaning.” • These extracts are from the opinion of Bayley, J., who delivered the judgment of the court, an opinion which Best, O. J. pronounced to be “ one of the most able judgments ever delivered,” and of which Mr. Justice Park said that he “ never read a more luminous judgment.” See Smith v. Sparrow, 4 Bing. 84; 13 Eng. C. L. 353, 354. From this unbounded praise, as well as from the opinion itself, it is to be inferred that the statute underwent much consideration before the opinion was delivered. There is, then, a distinction between labor and business; for though labor may be business, it is not necessarily so, and.the converse is equally true, that business is not always labor.
^Turning to the American cases, without reference at pres *346 ent to those of our own state, we find that Sunday contracts have been held to be void in Maine ,New Hampshire, Yermont, Massachusetts, Connecticut, Pennsylvania, Alabama, Michigan, and perhaps some other of the states. But the statutes of these states are quite different from ours. That of Maine declares, “ that no person or persons whatsoever, shall keep open his, her, or their shop, warehouse, or workhouse, nor shall, upon land or water, do any manner of labor, business, or work, works of necessity and charity only excepted, on the Lord’s day, or any part thereof.”
The New Hampshire statute, entitled “an act for the better observation of the Lord’s day,” etc., provides “ that no tradesman, artificer, or any other person whatsoever, shall do or exercise' any labor, business, or work of their secular callings, .works of necessity and mercy only excepted, nor use any game, play, or recreation, on the first day of the week, commonly called the Lord’s day, or any part thereof.”
The Yermont and Connecticut statutes are, “that no person shall exercise any secular labor, business, or employment, except such as necessity and acts of charity require.”
The Massachusetts act prohibits any person from “keeping open his shop, warehouse, or workhouse, or doing any manner of labor, business, or work, except only works of necessity and charity, or being present at any dancing, or any public diversion, show, or entertainment, or taking part in any sport, game, or play, on the Lord’s day.”
The Pennsylvania statute is, that “if any person shall do or perform any worldy employment, or business whatsoever, on the Lord’s day, commonly called Sunday, works of necessity and charity only excepted, or shall use or practice any unlawful game, hunting, shooting, sport, or diverson whatsoever, on the same day, and be convicted thereof,” he shall forfeit, etc.
The Alabama law provides thaí “ no worldy business or employment, ordinary or servile work (works of necessity or charity oxcepted), nor shooting, sporting, hunting, gaming, ^racing, fiddling, or other music for the sake of merriment, nor any kind of playing, sports, pastimes, or diversions, shall be done, performed, or practiced by any person or persons within this territory, on the Christian Sabbath, or first day of the week, commonly called Sunday; and every person being of the age of fourteen years or upward, offending in the premises, shall, for such offense, *347 forfeit and pay the sum of two dollars ; and no merchant, or shopkeeper, or other person, shall keep open store, or dispose of any wares or merchandise, goods or chattels, on the first day of the-week, commonly called Sunday, or sell or barter the same, upon pain of forfeiting the sum of twenty dollars for every such offense.”
The Michigan statute is like that of Massachusetts. It declares-that “ no person shall keep open his shop, warehouse, or workhouse, or shall do any manner of labor, business, or work, except only works of necessity and charity,” etc.
I have thus given, at a somewhat inconvenient length, these several statutes. Each of them contains a prohibition of “business,” and it is fairly inferable, from the adjudicated cases, that it. was under this word “ business,” and not under the terms “ work ” or “labor,” that the contracts declared void were deemed to fall. Thus, Shepley, J., in delivering the opinion of the Supreme Court of Maine, that a note, made on Sunday,' for the price of a horse-bought on that day, was void, placed the decision upon the ground that the language of the Maine statute was “ so explicit, that any doubt of the intention to prohibit trade and business of every description, which could not be a ‘work of necessity or charity on that day, would seem to be precluded.” Towle v. Larrabee, 26 Maine, 466.
Lovejoy v. Whipple, 18 Vermont, 379, was an action upon a promissory note, executed upon a Sunday in consummation of a contract previously made. The court held the note to be void, saying : “ It is difficult to perceive how the meeting upon the Sabbath, by previous appointment, and executing a promissory note in consideration of a previous contract, *could be other than secular business, when it is not claimed to have been a matter of ‘necessity or charity.’ ”
In Pattee v. Greeley, 13 Met. 284, a bond executed on the Lord’s day was held to be void. The court impliedly admitted that its execution was not “work” in^the strict sense of that word, but, the Massachusetts statute containing the word “ business,” the court said: “ The intention of the legislature, by this statute, was to prohibit secular business on the Sabbath; and this prohibition is not confined to work, in a strict sense (manual labor), but the making-of bargains, and trafficking of all kinds, being liable to occasion disputes, and require the action of more than one, are as much within the spirit of the prohibition.” This seems clearly to allow' *348 that the making of a bargain is not “ work: ” or “ labor,” according to the proper signification of those words.
The Pennsylvania statute, as we have seen, does not contain the word “work” or “labor.” It prohibits “worldly employment or business.” In Berrill v. Smith, 2 Miles, 402, a contract made on a Sunday, for the hire of horses to be used on a pleasure excursion, was declared void, on the ground that not only “worldly business," but also “sports or diversion” on Sunday were prohibited by the statute.
O’Donnell v. Sweeney, 5 Ala. 470, is directly in point, the court there holding that the sale of a horse on Sunday was void, because “ it is a worldly ‘ business or employment,’ and falls within the letter, .as well as within the meaning of the statute.”
Adams v. Hamell, 5 Doug. (Mich.) 73, was a case of an exchange of horses. The court decided against the validity of the contract, -saying that “ no case could be more clearly a matter of business within the statute.”
It thus seems to be the .common expression of the courts that the making of a contract is business,, within the meaning of these acts. At least this is the word, and not work or labor, usually employed to define the transaction. But the argument that the words “ common labor ” were not intended by the legislature to embrace the mere making of a contract, *does not rest on the language of courts alone, strongly as it is supported by that language. There .are other and yet more powerful considerations that sustain it. First. The law is presumed to use words in their ordinary signification, unless a contrary intent is plainly apparent. But neither in common parlance, nor in its strict philological sense, does the expression “common labor” embrace the simple making of a bargain. The word labor comes from the Latin verb labo, which is thus rendered in one of the most approved lexicons : “ To totter, to be ready to fall, to be on the point of falling, to waver, to be at a loss, to hesitate.”—Middle’s Lexicon. By the same authority, the Latin noun labor is thus translated: “ Labor, pains combined with ■physical effort.” Or, metonymically, “ activity, industry, hardship, misfortune, trouble, distress.” The English word “labor ” is thus •defined by Walker: “The act of doing what requires a painful •exertion of strength; pains, toil; work to be done; work done; performance; exercise; motion with some degree of violence, childbirth ; travail.” Webster’s definitions are: “ 1. Exertion of mus *349 cular strength, or bodily exertion which occasions weariness;; particularly, the exertion of the limbs in occupations by which subsistence is obtained, as in agriculture and manufactures, in distinction from exertions of strength in play or amusements, which are denominated exercise, rather than labor. Toilsome work; pains; travail; any bodily exertion which is attended with fatigue. After the labors of the day, the farmer retires, and rest is sweet. Moderate labor contributes to the health. 1 What is obtained by labor, will of right be the property of him by whose labor it is gained.’— Rambler. 2. Intellectual exertion; application of the mind which occasions weariness; as, the labor of compiling and writing a history. 3. Exertion of mental powers, united with bodily employment; as, the labors of the apQstles in propagating Christianity.. 4. Work done, or to be done; that which requires wearisome exertion. ‘Being a labor of so great difficulty, the exact performance thereof we may rather wish than look for.’—Hooker. 5. Heroic-^achievement; as, the labors of Hercules. 6. Travail; the pangs and efforts of childbirth. 7. The evils of life; trials; persecution, etc. ‘ They rest from their labors.’—Rev. xiv.”
A laborer is defined by Webster to be “ one who labors in a toilsome occupation, a man who does work that requires little skill, as-distinguished from an artisan.”
Now, by nothing short of the most strained and unreasonable construction, could the mere making of a contract be brought within either of the aforegoing definitions. The idea of toil, of that which does or may produce weariness, is inseparable from the idea conveyed by the word labor, or, more strictly speaking, is included in the idea it conveys. But what toil, what weariness of the body or mind, is there in making half the contracts that are made ? A meets B and says to him, “ I will give you fifty dollars-for your horse.” B replies, “Agreed.” Here is a contract made in ten seconds, and in ten words—but where is there any labor ? O' makes his promissory note, or bond, or due-bill, to D; who would think of calling the transaction laborious? The woi’d “labor” is. usually employed to signify manual exertion of a toilsome nature. This is its ordinary, popular signification ; the meaning that must be given to it, wherever it occurs in a statute, unless it is plainly-used in a more enlarged or restricted sense. That it is not used in its most enlarged sense, in our statute, is obvious. Mere thought may be so earnest and long-continued as to be laborious, but no one- *350 ■would think of punishing a man simply for thinking. To compose .and write an ordinary letter of friendship, is no small task to many persons, but surely it is not “common labor,” though'it is a very common occurrence. The study of mathematics or metaphysics is often called “ hard work,” but it may, nevertheless, be performed on Sunday. There is a limit, then, and what better limit can be found than that furnished by the common understanding of the phrase “common labor.” But making contracts is a common business of men, it is said, and therefore ought to be prohibited on Sunday. Let this bo granted, the question yet remains, has it been prohibited? Does a prohibition of “common labor” *forbid it? There are few contracts of more frequent occurrence than marriage. In a legal point of view, it is a civil contract and nothing more. But will any one say that a marriage solemnized on Sunday is void? Are the thousands of Sunday marriages that have taken place in •Ohio nullities, the union of the parties meretricious, and their issue illegitimate ? No one will pretend it. All contracts, then, are not within the statute. But if some are within and some without it, where is the line to be drawn ? Will it be said that written contracts are embraced by it because writing is a manual labor ? The fact is not so in a large majority of eases. By far the most numerous written agreements are promissory notes. To write such a note requires some manual exertion, but no labor, in the proper or common signification of the word. Nor is it to be supposed that the legislature intended to discriminate between these contracts, and .allow the verbal and forbid the written, or to make the validity of a contract depend upon whether it is long or short. There would be no good sense in such discriminations, and a thing so irrational is not to be admitted. It is not to be understood, however, that be•cause a Sunday contract may be valid, therefore business may be transacted upon that as upon other days; as, for instance, that a merchant, not of the excepted class, may lawfully keep open store for the disposition of his goods on the Sabbath. To wait upon customers, and receive and sell his wares, is the common labor of a merchant, and there is a broad distinction between pursuing this .avocation and the case of a single sale out of the ordinary course ■of business.
Secondly. It is a general presumption that every word in a statute was inserted for some purpose. Mere idle and useless repetitions ■of meaning are not to be supposed, if it can be fairly avoided. *351 Now, if by a prohibition of labor, all business is prohibited, how is it that the latter word is found in every one of the numerous statutes I have quoted, with the single exception of our own ? Could there bo clearer evidence that the words “ work ” and “ labor,” one or both of *whieh are found in each of these acts save that of Pennsylvania, were not, in the opinion of the law-makers, synonymous with, or so comprehensive, as the word “ business,” and that, consequently, this last word was employed to embrace what the two former did not include ? And when it is remembered that neither in their strict sense nor popular signification are the words “work” and “ labor ” appropriate to describe the mere making of a contract, can it reasonably be doubted that it is the word “ business,” in these several laws, by which it was intended to embrace contracts, and which has had the effect to prohibit them ?
Thirdly. When a considerable change is made in the phraseology of a former law, the inference is reasonable that a change of meaning was also intended. Now, with perhaps but one exception, all the foreign statutes I have quoted are of much older date than ours. That they were well- known to the framers of our law, will be apparent to any one who will make a comparison. The 'similarity and often identity of language evidently show that our statute is in part copied from them. But the word “ business ” is left out. Is it reasonable to suppose that this was done without design? It certainly is not. Was it done upon the supposition that the word was useless, that it was embraced by the expression “common labor?” This is altogether improbable. The legislature knew that the expressions wore not synonymous, and that much that is business is not labor. And they had no warrant in the adjudicated cases, that the courts would construe a prohibition of common labor to amount to a prohibition of a bargain. It is difficult, then, to see why the word “business” was dropped, the word “labor” alone retained, and the qualifying adjective “common” prefixed to it, unless we suppose that by the phrase “common labor” was meant ordinary manual labor as contradistinguished from intellectual. Thus to construe it, is to give to it both its strict and popular signification, and this, as we have before said, ought to be done, unless a different intent is plainly apparent.
*Fourthly. But whatever doubts might remain are removed, it seems to us, by. the second section of the act, by which any sale or barter of spirituous liquors on a Sunday (except *352 to travelers on a journey), is prohibited under a penalty not exceeding five dollars. Now this section is wholly useless -if all sales, not demanded by necessity or charity, are forbidden by the-prohibition of common labor in the preceding section. It was not enacted to create different penalties, for the maximum is the satire in both sections, and though there is a minimum in the first, and none in the second, it can not be supposed that a sale of liquor was-considered a loss grievous offense than a salo of bread. Both might, be sold without any requirement of necessity or charity, and if discriminating penalties were thereby to be incurred, it would seem, obvious that the heavier punishment should fall on the vendor of the liquor. Nor was it enacted for the benefit of travelers. "We can not suppose the legislature gravely to have passed a law, in order-to provide that wayfarers might drink without necessity, but that, other people should not. It is clear, therefore, that we must attribute to the legislature the doing of a vain thing, in the enactment of this section, if we give to the first section, the construction-contended for by the defendant. But we ought not so to do, when there is a reasonable construction that gives effect to both sections.
Lastly. -The law in question is a penal statute, and is therefore to-be construed strictly. Such statutes are not to be extended by construction.
“ But to allow men to make bargains on the Sabbath is to let them-desecrate that holy day, and it should not be granted that the legislature would suffer that.” This is the language of the modern English cases, and perhaps it is’ consistently used in a country where-Christianity is a part of the law, and in which there is an established church, and an omnipotent parliament. But the general assembly of Ohio is not, as we have shown, a guardian of the sanctity of any day. If it may protect the first day of the week from desecration, because it is the Christian Sabbath, it may, in like manner, protect the sixth day because it is the holy day of the *Mahommedan, and the seventh day because it is the Sabbath of the Jew and the Seventh-day Baptist.
Nay, more, it may protect the various festival days which, by some of the churches, are considered scarcely less sacred than the Sabbath day. But were the power conceded to the legislature, it has not attempted to exercise it. ■ It would, in the opinion of most Christians, be a far greater desecration of Sunday to go to an infidel lecture on that day than to buy a tract of land; and yet the former- *353 is certainly not unlawful. The statute leaves a man to study atheism or the Bible on the Lord’s day, as he may see fit, although, in the judgment of most men, the former occupation is as vicious as the latter is laudable. There are various religious duties, the performance of which on Sunday is considered peculiarly appropriate; various occupations or amusements, harmless in themselves, but deemed by most Christians irreligious if indulged in on the Sabbath ; yet the law neither enforces the one nor forbids the other. In a word, we repeat, that, legally considered, Sunday is merely a day of rest. To the Christian it is far more. With him, it has a sanctity not derived from human laws, but stamped upon it by the Almighty. His observance of it is not the mere performance of a civil duty, but an obedience to a precept of the Most High. In this faith he is protected; the faith itself is regarded with respect ; but the law does not enforce it.
After the most careful consideration, we are unanimously of opinion that the defense can not prevail. It follows that we do not. agree with the decision in Sellers v. Dugan, 18 Ohio, 489. That judgment was given by a majority only of the court, and is contrary to the former decision, pronounced by two of the judges, in Swisher v. Williams, Wright, 154. It thus appears that three judges of the Supreme Court have been of one, and an equal number of the contrary, opinion upon this question. Under such circumstances, Sellers v. Dugan can have but little weight as authority. Being well satisfied that it was incorrectly decided, we do not hesitate to overrule it.
♦Perhaps the judgment in Cincinnati v. Rice, 15 Ohio, 225, does not conflict with the present decision. It is possible that that judgment was correct upon another ground than that stated in the opinion delivered. Besides, the court seems to have gone upon the idea that keeping open store and bartering and selling upon Sunday, in the same manner as is customary upon other days, is “ common labor.” But this, as we have before said, is a quite different thing from a single transaction involving no labor.
Let an entry be made remanding this cause to the district court for further proceedings, with a certificate that, in the opinion of this co irt, the contract in the bill mentioned is not, by reason of its execution and delivery on a Sunday, invalid.
353